IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ROBIN KIM SHIVOCK,                )
                                  )
            Plaintiff,            )
                                  )
      v.                          )   Civil Action No. 13-492-GMS
                                  )
CAROLYN W. COLVIN, Acting         )
Commissioner of Social Security,  )
                                  )
            Defendant.            )

## **MEMORANDUM**

### I. **INTRODUCTION**

The plaintiff Robin Kim Shivock ("Shivock") filed this action against defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), on May 6, 2013. (D.I. 2.) Shivock seeks review of the Commissioner's final decision denying her applications for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), and supplemental security income ("SSI") under Title XVI. (D.I. 11 at 89–92.) Shivock's claims were denied initially on January 12, 2010, and then again on reconsideration on September 10, 2010. (*Id.*). Shivock requested a hearing before an administrative law judge ("ALJ"), which was held on July 28, 2011. (*Id.* at 42–88.) The ALJ issued a decision on August 17, 2011, finding that Shivock was not disabled under the Act. (*Id.* at 25–37.) The Appeals Council denied Shivock's request for review, and the Commissioner affirmed the ALJ's decision on December 7, 2012. (*Id.* at 1–3.) Presently before the court are the parties' cross-motions for summary judgment. For the reasons that follow, the court will grant the Commissioner's motion (D.I. 18.) and deny Shivock's motion. (D.I. 15.)

## II. BACKGROUND

Shivock contends that she has been unable to work since October 1, 2007, primarily due to degenerative disc disease and herniations in the cervical spine. (D.I. 11 at 56). She also suffers from fibromyalgia, spinal endometriosis, tarsal tunnel, and Hepatitis B. (*Id.* at 188.) Shivock claims that the pain from these ailments impairs her ability to work and that her suffering makes her depressed, anxious, and unable to maintain focus. (*Id.* at 56, 58, 307.) Shivock was forty-seven years old when she filed her application in 2008. (*Id.* at 35.) She has a high school education with one year of undergraduate study, and is able to communicate in English. (*Id.*) Her conditions began when she was in a work-related accident on April 12, 2002, and an auto accident less than a month later exacerbated her symptoms. (*Id.* at 30.) Shivock has undergone two neck surgeries as a result of the accidents. (*Id.* at 51.)

### A. Medical History

#### 1. Mental Impairments

Shivock alleges that she has mental disabilities that impair her ability to work. Shivock claims that her chronic pain "affect[s her] ability to focus" and makes her forgetful. (D.I. 11 at 56.) The side effects from her medication also make her tired. (*Id.* at 58.) Shivock also claims that she suffers from anxiety and depression and that her memory is "not what it used to be." (*Id.* at 50, 70, 307.)

During the relevant time period, Shivock was not treated by a mental health doctor but was prescribed Xanex for her anxiety by her primary care physician, Dr. Anna Marie Sullivan. (*Id.* at 70.) After initially denying her claim for DBI/SSI, the Social Security Administration ("SSA") requested that Shivock see Dr. Jodi L. French, a licensed psychologist, on November 24, 2009, for a consultative mental status evaluation. (*Id.* at 303.) Dr. French found that Shivock had mild

anxiety and depression, but no evidence of dementia. (*Id.* at 308.) Dr. French concluded that Shivock's mild anxiety symptoms—frustration and worrying—could mildly interfere with her ability to cope with difficult and stressful interpersonal interactions. (*Id.*) Dr. French assigned Shivock a Global Assessment of Functioning ("GAF") score of 65.[1] (*Id.*)

On January 12, 2010, Dr. D. Peterson, a state agency medical consultant, examined Shivock. (*Id.* at 328–41.) In his Psychiatric Review Technique, Dr. Peterson concluded that Shivock showed mixed anxiety and depressed features, but that her condition was not severe. (*Id.* at 340.) He found that her functional limitations in daily activities, social functioning, and maintaining concentration, persistence, or pace were mild. (*Id.* at 338.) In another Psychiatric Review Technique performed on September 9, 2010, Dr. P.H. Woods, a second state agency medical consultant, affirmed Dr. Peterson's findings and noted that Shivock had the mental capacity to perform simple, work-related tasks. (*Id.* at 356–69.) Both doctors noted that, despite Shivock's alleged memory problems, their examinations did not reveal cognitive difficulties. (*Id.* at 329, 357.)

### 2. Physical Impairments

Shivock was injured at work on April 12, 2002, and was involved in an auto accident one month later, resulting in ongoing neck pain. (*Id.* at 30.) Shivock sought treatment from Dr. Bruce Rudin on November 14, 2007, for neck discomfort and weakness in her upper extremities. (*Id.* at 235.) Dr. Rudin, however, found only some degenerative changes. (*Id.*) Shivock underwent surgery on January 7, 2008, for posterolateral fusion of her cervical spine after a CT scan revealed

---

[1] The GAF scale ranges from 1 to 100. Clinicians use the scale to indicate their overall judgment of a person's psychological, social, and occupational functioning. *See Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000). A GAF score of 61 to 70 corresponds to: "Some mild symptoms (e.g., depressed mood and mild insomnia) *or* some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

3

a possible non-union at the C6-7 vertebra. (*Id.* at 236.) At her follow-up appointment, Shivock reported sixty-five to seventy percent improvement in her neck pain, and she had full motor strength in her upper extremities. (*Id.* at 237.) A cervical spine X-ray revealed that her "surgical hardware" was in a good position. (*Id.*)

Dr. Rudin ordered another CT of Shivock's cervical spine on March 12, 2008, after she reported renewed pain. (*Id.* at 239.) Shivock's CT scan revealed good positioning of the posterior instrumentation. (*Id.*) Further examination showed that Shivock had full motor strength in the upper and lower extremities, intact and symmetrical reflexes, and negative Hoffman's and clonus examinations. (*Id.* at 241.) On July 2, 2008, an x-ray of Shivock's cervical spine showed a "solidly healed" anterior column. (*Id.* at 242.)

Shivock again sought treatment from Dr. Rudin on August 4, 2008, this time with complaints of daily mild "low" back pain. (*Id.* at 243.) An MRI showed "effectively normal" images. (*Id.* at 244.) Dr. Rudin reported that he was "very comfortable" saying that there was no spinal etiology and that the most likely problem was fibromyalgia. (*Id.*)

Dr. Sullivan completed a medical report form on March 26, 2009. (*Id.* at 299–302.) The questionnaire stated that Shivock could never sit, stand, walk, climb, bend, squat, reach or crawl; could lift less than ten pounds; and had no fine motor or hand manipulation limitations. (*Id.* at 300.) Dr. Sullivan also noted that Shivock had moderate restrictions of activities of daily living and moderate difficulty in maintaining social functioning. (*Id.* at 301.) She also said that Shivock "often" had difficulties in maintaining concentration, persistence, or pace, and had "continual" episodes of decompensation, each of extended duration. (*Id.*)

Dr. Sullivan ordered another MRI on November 4, 2009. (*Id.* at 375.) The scan revealed "minimal degenerative changes of bilateral hip joints," and the rest of the pelvis and hips were

4

"radiographically unremarkable." (*Id.*) On December 8, 2009, Dr. Sullivan's completed a Residual Functional Capacity ("RFC") questionnaire, in which she stated that Shivock could walk zero blocks, could sit or stand for less than two hours in an eight-hour day, and needed to alternate between sitting and standing. (*Id.* at 314–15.) Dr. Sullivan also indicated that Shivock could never lift or carry less than ten pounds and that she could never look down, look up, or turn her head from side to side. (*Id.* at 315.)

The state requested a consultative examination by Dr. Douglas Wright on July 29, 2009. (*Id.* at 346–47.) Dr. Wright found that Shivock walked with a normal gait, had full motor strength in her upper and lower extremities, had no significant limitation in her ability to rotate her head during a range of motion ("ROM") examination, had full grip strength, and showed a negative straight-leg raising test. (*Id.*) Dr. Edgar Folk, another agency consultant, performed an additional examination on December 16, 2009. (*Id.* at 317–19.) Dr. Folk found that the tenderness reported by Shivock was indicative of fibromyalgia but found no edema, clubbing, or cyanosis. (*Id.* at 318.) Dr. Folk also noted good pulses in Shivock's extremities. (*Id.*)

By request, Dr. A. Serpick, a state-agency medical consultant, completed an RFC assessment form on December 30, 2009. Dr. Serpick opined that Shivock could occasionally lift twenty pounds, frequently lift ten pounds, sit for six hours in an eight-hour workday, stand or walk for at least two hours in an eight-hour workday, and push/pull an unlimited amount. (*Id.* at 321.) Dr. P.H. Moore, another state agency physician, completed an RFC assessment on August 17, 2010, that found the same limitations for Shivock as Dr. Serpick did. (*Id.* at 349.) Both physicians indicated that Shivock could only "occasionally" climb, balance, stoop, kneel, crouch or crawl. (*Id.* at 322, 350.)

5

On July 29, 2011, one day after the ALJ hearing, Dr. Sullivan resubmitted her original December 8, 2009, report. (*Id.* at 394–99.)

B. **ALJ Hearing**

1. **Shivock's Testimony**

Shivock and a vocational expert ("VE") testified before the ALJ on July 28, 2011. (D.I. 11 at 42–88.) Shivock explained that she had neck surgeries stemming from a work accident and automobile accident, both in 2011. (*Id.* at 51–52.) In addition to her neck problems, she also experienced "burning" low back pain, fibromyalgia, and migraines. (*Id.*) Shivock takes Percocet daily for her pain, and, without it, she cannot get out of bed in the morning. (*Id.* at 52.) Shivock has also been prescribed Lyrica for her fibromyalgia, but she rarely takes the medication because it is too expensive. (*Id.*) Shivock also said that the pain affects her ability to focus and concentrate. (*Id.*) For her activities of daily living ("ADL"), Shivock reported that she watches TV, spends time with her daughter, helps prepare meals, reads novels, cleans, and does laundry. (*Id.* at 60–61.) She also testified that she is able to walk up and down stairs, walk for one to two blocks, lift ten pounds, sit for half an hour, and possibly walk two hours out of an eight-hour workday. (*Id.* at 59–61.)

2. **Vocational Expert Testimony**

VE Dr. James Michael Ryan also testified at the hearing. (*Id.* at 74–87.) He classified Shivock's former jobs as light and unskilled to sedentary and skilled. (*Id.* at 78.) Dr. Ryan said that someone with Shivock's RFC could hold routine, unskilled, low-stress, low-concentration, and low-memory jobs. (*Id.* at 80–81.) According to Dr. Ryan, however, Shivock would not be able to perform her past work. (*Id.* at 83.) Dr. Ryan testified that Shivock could hold the following light, unskilled occupations: machine tender, general office helper, quality control worker, and

grading and sorting worker. (*Id.* at 81.) Dr. Ryan also noted that Shivock could perform additional sedentary, unskilled jobs including inspector, finish machine operator, and grading and sorting operator. (*Id.* at 82.) Dr. Ryan explained that these jobs were consistent with the Dictionary of Occupational Title ("DOT") criteria.[2] (*Id.*)

Shivock's attorney posed a number of hypotheticals to the VE. First, Dr. Ryan acknowledged that, in his opinion, someone (1) who would be unable to stand, walk, sit more than two hours in a workday, and (2) who would be absent more than four days a month, "would not be capable of sustaining full-time employment." (*Id.* at 84.) Dr. Ryan also opined that a person (1) who had moderate ADL restrictions and (2) who had difficulty maintaining concentration, persistence, and pace also would not be able to work. (*Id.* at 86.) Finally, Dr. Ryan testified that a person (1) who was limited to lifting ten pounds per day, (2) who experienced dizziness as a side effect of medication, (3) who was persistently fatigued throughout the day, (4) who would need to take naps and rest during the day, and (5) who would not be able to sit or stand more than two hours in a workday would also not be employable. (*Id.* at 87.)

## C. ALJ Determination

The ALJ conducted the standard five-step procedure to determine whether Shivock was disabled. The ALJ found that Shivock had severe impairments—degenerative disc disease, fibromyalgia, and depression—but they were not of listing-level severity. (*Id.* at 27.) The ALJ also found that Shivock's migraines were not a severe impairment. (*Id.*) The ALJ found that Shivock had the RFC to perform light work in simple, routine unskilled jobs that involve low-stress, low-memory, and low-concentration. (*Id.* at 29.) Though Shivock was unable to perform past jobs, the ALJ determined that there were a number of jobs existing in the national economy

---

[2] Dr. Ryan conceded that the DOT does not address a sit/stand option. Rather, he used his expert judgment in determining how to apply those factors. (D.I. 11 at 82.)

that she could perform based on her RFC, age, education, and work experience. (*Id.* at 36.) For these reasons, the ALJ found that Shivock was "not disabled." (*Id.* at 37.)

## III. STANDARD OF REVIEW

A reviewing court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3); *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992); *see also Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, [the court is] bound by those findings, even if [it] would have decided the factual issue differently."). "Substantial evidence" means more than "a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The inquiry is not whether the reviewing court would have made the same determination but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).

## IV. DISCUSSION

Shivock contends that the ALJ's decision is flawed on five grounds. (D.I. 16 at 1–2.) First, Shivock asserts that the ALJ's decision to reject the opinions of Dr. Sullivan, the treating physician, was not supported by substantial evidence. (*Id.*) Second, Shivock asserts that the ALJ improperly rejected portions of the state agency consultants' opinions and instead substituted her own lay judgment. (*Id.* at 2.) Third, Shivock claims that the ALJ's determination that Shivock had the RFC to perform light work was not supported by substantial evidence. (*Id.*) Fourth, Shivock argues that the ALJ erred by failing to apply Medical-Vocational guidelines. (*Id.*) Lastly, Shivock contends that the hypothetical question posed to the VE did not comprehensively describe

Shivock's impairments, and therefore the ALJ's ultimate ruling accepting the VE's testimony was not supported by substantial evidence. (*Id.*)

A. **Applicable Statute and Law**

The Social Security Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §1382c(a)(3)(A). The Commissioner has promulgated regulations for determining disability by application of a five-step sequential analysis. *See* 20 C.F.R. § 404.1520. The ALJ, the reviewing Appeals Council, and the Commissioner evaluate each case according to this five-step process until a finding of "disabled" or "not disabled" is obtained. *See* § 404.1520(a). The process is summarized as follows:

1. If the claimant currently is engaged in substantial gainful employment, he will be found "not disabled."
2. If the claimant does not suffer from a "severe impairment," he will be found "not disabled."
3. If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, *and* has lasted or is expected to last for a continuous period of at least twelve months, the claimant will be found "disabled."
4. If the claimant can still perform work he has done in the past ("past relevant work" despite the severe impairment, he will be found "not disabled."
5. Finally, the Commissioner will consider the claimant's ability to perform work ("residual functional capacity"), age, education and past work experience to determine whether or not he or she is capable of performing other work in the national economy. If he or she is incapable, a finding of disability will be entered. Conversely if the claimant can perform other work, he will be found "not disabled."

§ 404.1520(b)–(f); *see also Carey v. Astrue*, No. 10-413-GMS, 2015 WL 1467205, at *6 (D. Del. Mar. 30, 2015) (paraphrasing the five-step process for determining disability).

The disability determination analysis involves a shifting burden of proof. *See Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983). In the first four steps of the analysis, the burden is on the claimant to prove every element of his or her claim by a preponderance of the evidence. *Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000). At step five, however, the burden shifts to the Commissioner to prove that there is some other kind of substantial gainful employment the claimant is able to perform. *See id.*; *see also Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1983); *Olsen v. Schweiker*, 703 F.2d 751, 753 (3d Cir. 1983). Substantial gainful employment is defined as "work that—(a) involves doing significant or productive physical or mental duties; and (b) is done (or intended) for pay or profit." 20 C.F.R. § 404.1510. When determining whether substantial gainful employment is available, the ALJ is not limited to consideration of the claimant's prior work, but may also consider any other substantial gainful activity which exists in the national economy. *See* 42 U.S.C. § 423(d)(1)(A), (2)(A); *Heckler v. Campbell*, 461 U.S. 458, 460 (1983).

### B. Dr. Sullivan's Opinion

Shivock contends that the ALJ should have afforded the opinion of treating physician Dr. Sullivan controlling weight. The ALJ uses medical sources, "including [the] treating source, to provide evidence, including opinions, on the nature and severity of [the claimant's] impairments." 20 C.F.R. § 1527(d)(2). Generally, the ALJ must give more weight to opinions from treating sources but is only required to give controlling weight if he finds that "the treating source's opinion on the issue(s) of the nature and severity of [claimaint's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." § 1527(c)(2); *see also Brown v. Astrue*, 624 F.3d 193, 196 (3d Cir. 2011) (noting that a treating physician's opinion may be outweighed by other

10

evidence). Here, because the ALJ did not afford the treating source controlling weight, he was obligated to explain his decision to give weight to other sources. *See* 20 C.F.R. § 404.1527(e)(2)(ii).

The court finds that the ALJ properly rejected Dr. Sullivan's opinions because there was substantial evidence showing the opinions were not consistent with other clinical evidence. (D.I. 11 at 33–34.) Dr. Sullivan's own treatment notes were inconsistent: she had indicated that Shivock had good pain control, appeared more comfortable, and was in no acute distress. (*Id.* at 376–93.) Furthermore, Dr. Sullivan's restrictive limitations were at odds with Shivock's reported daily activities. For example, Dr. Sullivan noted that Shivock could not look up or down or turn side to side. (*Id.* at 315.) Shivock herself testified, however, that she performed daily activities requiring such movement including driving, styling her hair, and reading novels. (*Id.* at 50–51, 61–62, 64.)

Furthermore, Dr. Sullivan's opinions contrast with the treatment notes of Dr. Rudin, who indicated that Shivock had full strength in all extremities, full ROM with negative straight leg raising, and substantial improvements in her cervical neck pain after undergoing her second surgery. (*Id.* at 235–98.) The ALJ also noted that Dr. Sullivan's notes were inconsistent with Dr. French's findings, which described Shivock's gait and motor movements as normal. (*Id.* at 303–10.) Dr. Sullivan's notes also conflict with Dr. Wright's notes, which reported that Shivock moved with a normal gait without an assistive device, had normal ROM in her lumbar and cervical spine with negative straight leg raising, and had full strength in all extremities. (*Id.* at 346–47.) Finally, Dr. Sullivan's notes are inconsistent with the diagnostic imaging tests, which revealed no physiological basis for Dr. Sullivan's reported limitations. (*Id.* at 244.) Thus, the court finds that the ALJ did not err in rejecting Dr. Sullivan's opinions because the ALJ's decision was supported by substantial evidence.

### C. Non-Examining, State-Agency Physicians

Shivock next contends that the ALJ erred by substituting lay judgment over the expertise of state agency non-examining medical doctors Drs. Serpick and Moore, both of whom found that Shivock would have limitations in how far she would be able to walk and stand. The ALJ, however, is solely responsible for formulating an individual's RFC, and he is not required to adopt the opinion of any particular medical source on the issue. 20 C.F.R. §§ 404.1527(d), 404.1546, 416.927(d), 416.946. The conclusions of non-examining medical experts are findings of fact but "are not in themselves evidence at the level of the administrative review process at which they are made." 20 C.F.R. § 404.1527(e)(1)(i).

Here, the ALJ applied little weight to the portions of Dr. Serpick's and Dr. Moore's opinions concerning Shivock's sitting, standing, walking, and postural limitations. (D.I. 11 at 34–35.) The ALJ also discounted the doctors' opinions that Shivock could only occasionally climb (*e.g.*, a ramp, stairs, ladders, ropes, and scaffolds), balance, stoop, kneel, crouch and crawl. (*Id.*) The court finds substantial evidence for the ALJ's decision to apply little weight to these opinions. First, there was no evidence in the record demonstrating that Shivock's ability to stand, walk, or sit was as limited in the way either doctor opined. (*Id.*) Indeed, Shivock's typical activities include shopping in stores two to three times a week, washing laundry twice a week, caring for her grandchildren, cleaning, and vacuuming. (*Id.* at 30–34, 50–51, 61–62, 64, 198, 215–18, 237, 304–05.) She also walked with a normal gait, had negative straight leg raising tests, had full muscle strength in her lower extremities, and showed "effectively normal" lumbar and thoracic spine MRIs. (*Id.* at 237–38, 241, 243–44, 246.) The ALJ's decision to disregard the walk, stand, and sit opinions of Drs. Serpick and Moore therefore was proper. And the ALJ still accounted for these

limitations in the RFC assessment, giving Shivock the option to alternate between standing/walking and sitting.

Furthermore, the ALJ's decision to disregard the opinions concerning Shivock's limitations on climbing, balancing, stooping, kneeling, crouching, and crawling was also proper—the available evidence in the record did not support such a determination. In any event, none of the jobs ultimately put forth by the VE require any of these actions. Thus, the ALJ's exclusion of these limitations from the RFC—even if supported—had no effect on the ultimate outcome. (*Id.* at 35.)

Moreover, as discussed below, the ALJ did afford "great weight" to Dr. Serpick's and Dr. Moore's opinions concerning Shivock's lifting and carrying capabilities. (*Id.* at 34.) This tends to support the view that the ALJ carefully examined and parsed each of the opinions to determine which portions were supported by the record and which were not. *See* 20 C.F.R. § 404.1527(c)(4) (finding that the more consistent an opinion is with the record as a whole, the more weight it will be given).

### D. RFC to Perform Light Work

Shivock asserts that the ALJ's determination that Shivock had the RFC to perform light work was not supported by substantial evidence. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairments." *Fargnoli*, 247 F.3d at 41 (*Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000)); *see also* 20 C.F.R. §§ 404.1545(a), 404.1546. Evidence elicited from medical records, descriptions of limitations by the claimant, and observations from medical examiners or other third parties may all figure into one's RFC, but ultimately the ALJ possesses the sole responsibility to make the assessment. 20 C.F.R. § 404.1545(a).

The ALJ's RFC assessment limited Shivock to light work that involved lifting/carrying twenty pounds occasionally and ten pounds frequently; standing or sitting for only twenty to thirty minutes at a time with the option to alternate between sitting and standing; no overhead reaching or repetitive neck turning; no exposure to heights, hazardous machinery, humidity, or temperature extremes. (D.I. 11 at 29.) Further, in accommodating Shivock's mental constraints, the ALJ determined that Shivock was limited to one- or two-step simple, routine tasks involving low concentration and memory; no production requirements; low-stress work with little to no decision-making, judgment, or changes. (*Id.*)

The court finds that the ALJ's RFC determination was supported by substantial evidence in the record. Drs. Serpick's and Moore's RFC assessments each opined that Shivock was able to lift twenty pounds occasionally and ten pounds frequently (with unlimited push/pull abilities), to sit for a total of six hours, and to stand or walk for at least two hours in an eight-hour work day. (*Id.* at 321, 349.) Furthermore, Dr. Serpick found that Shivock's reported daily activities of dusting, shopping, and vacuuming "seem to be credible." (*Id.* at 325.) The ALJ assigned great weight to these portions of the doctors' opinions. (*Id.* at 34.) Indeed, in her testimony at the hearing, Shivock stated that she could lift ten pounds, walk and sit for less than two hours in an eight-hour workday, stand for ten to twenty minutes and walk up stairs. (*Id.* 59–61.) Since there is substantial evidence supporting the ALJ's determination that Shivock has the RFC to perform light work, the court finds that the ALJ did not commit legal error.

### E. Applying the Medical-Vocational Guidelines

Shivock asserts that application of the Medical-Vocational Guidelines would have found her disabled as of her fiftieth birthday and that the ALJ therefore erred in not applying the guidelines. Shivock was considered a "younger person" when she first filed for benefits, since she

14

was under fifty years old, and moved into "closely approaching advanced age" upon her fiftieth birthday. 20 C.F.R. § 404.1563(c), (d). When a person is in the "closely approaching advanced age" category, the SSA has noted that an ALJ can use the claimant's age as a factor in addition to the applicant's RFC and other evidence in the case. § 404.1563(a), (d). Though Shivock was in the "closely approaching advanced age" category at the time of the hearing, her age alone does not give her disabled status.

Here, the ALJ did not err in determining Shivock was not disabled based on her age. First, Shivock filed her claim when she was still considered a "younger person." "If [the claimant is] a younger person (under age 50), [the SSA] generally do[es] not consider that . . . age will seriously affect [claimant's] ability to adjust to other work."[3] § 404.1563(c). But even evaluating Shivock after she turned fifty years old, the court finds substantial evidence for the ALJ's determination. The VE testified and opinions from Shivock's RFC analyses found that, though she could not perform her previous jobs, there were still a substantial number of jobs in the national economy suitable for Shivock, notwithstanding her age. (*Id.* at 82.) The ALJ determined that Shivock's age alone did not preclude her from attaining gainful employment. 20 C.F.R. § 404.1563(d) ("If [the claimant is] closely approaching advanced age (age 50–54), [the SSA] will consider that . . . age along with a severe impairment(s) and limited work experience *may* seriously affect [the claimant's] ability to adjust to other work." (emphasis added)). There is no bright-line rule that claimants over age fifty are unable to work. The court finds that the ALJ did not err in applying the Medical-Vocational guidelines to Shivock.

---

[3] The regulation continues on to say: "[I]n some circumstances, we consider that persons age 45–49 are more limited in their ability to adjust to other work than persons who have not attained age 45." 20 C.F.R. § 404.1563(c). Thus, had the circumstances warranted, the ALJ could have considered Shivock's age as a factor in her ability to find work, when she was still under the age of fifty.

15

## F. VE Testimony

The VE found certain occupations suitable for Shivock based on her RFC, age, education, and work experience, pursuant to 20 C.F.R. § 404, Subpart P, Appendix 2. (*Id.* at 80–82.) The hypothetical questions posed to a VE need only incorporate those limitations that an ALJ accepts as credible and that are supported by the record. *See Jones v. Barnhart*, 364 F.3d 501, 506 (3d Cir. 2004).

Here, the VE testified that, in light of the ALJ's posited hypothetical, one with Shivock's RFC would be able to perform several jobs in the national economy. (D.I. 11 at 80-82.) The VE testified that his opinion was largely consistent with the occupational information contained in the DOT. (*Id.* at 82.) The DOT, however, did not address the possibility of alternating between standing and sitting—a limitation imposed by the ALJ. Therefore, the VE relied solely on his experience in opining that the identified jobs would allow for such alternating. It was not improper for the ALJ to accept the VE's testimony on the basis of his forty years of experience as a vocational consultant and thirty years as a Social Security vocational expert. (*Id.* at 36.) The VE's testimony therefore supports the ALJ's determination that Shivock could obtain substantial gainful employment and constitutes substantial evidence for that decision.

## V. CONCLUSION

For the foregoing reasons, this court finds that the ALJ's findings were supported by substantial evidence. Thus, the court will grant the Commissioner's motion for summary judgment, and deny Shivock's motion for summary judgment.[4]

---

[4] On July 25, 2012, the Social Security Administration published Social Security Ruling ("SSR") 12-2p, which "provides guidance on how we develop evidence to establish that a person has a medically determinable impairment of fibromyalgia, and how we evaluate FM in disability claims and continuing disability reviews under [T]itles II and XVI of the Social Security Act." SSR 12-2p, 2012 WL 3104869 (July 25, 2012). Thus, SSR 12-2p became effective in the interim, between the ALJ's decision (August 17, 2011) and the Appeals Council's decision to deny review (December 7, 2012). On July 7, 2015, the court requested that the parties brief the issue of whether SSR

Dated: July 31, 2015

                                                 UNITED STATES DISTRICT JUDGE

---

12-2p affected the outcome of this case, in light of the fact that the ALJ determined Shivock's fibromyalgia is a severe impairment. (D.I. 20.)

     After considering the parties' submissions, the court is satisfied that remand is not required. First, SSR 12-2p became effective *after* the ALJ's decision. It is the ALJ's decision that is reviewable as the final decision of the Commissioner. *See* 42 U.S.C. § 405(g) ("Any individual, after a*ny final decision of the Commissioner of Social Security* . . . may obtain a review of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides." (emphasis added)); *Fargnoli*, 247 F.3d at 38 ("The Appeals Council of the SSA declined further review . . . , making the ALJ's determination the final decision of the Commissioner."). The court *does not review* the Appeals Council's decision to deny review. *See Matthews v. Apfel*, 239 F.3d 589, 594 (3d Cir. 2001) ("No statutory authority . . . authorizes the court to review the Appeals Council decision to deny review."). While it recognizes that other district courts have remanded social security appeals in factually similar circumstances, the court is not persuaded these remands were procedurally proper. *See, e.g., Dry v. Comm'r, Soc. Sec. Admin.*, No. SAG-13-3168, 2014 WL 6983402, at *2 (D. Md. Dec. 9, 2014) ("SSR 12-2p went into effect after the ALJ's June 27, 2012, decision, but before the Appeals Council declined review of Ms. Dry's claims on August 27, 2013. . . . Accordingly, SSR 12-2p governed the Appeals Council's consideration of Ms. Dry's disability claims. However, it does not appear that the Appeals Council considered whether SSR 12-2p affected the outcome of Ms. Dry's claims. This Court and other district courts have found remand appropriate for consideration of SSR 12-2P where that ruling was issued between the ALJ's opinion and the decision of the Appeals Council.").

     Even assuming that SSR 12-2p should apply to Shivock's case, the court is not convinced that the outcome would be any different. After all the ALJ already determined that Shivock's fibromyalgia indeed qualified as a severe impairment. (D.I. 11 at 27); *see Dry*, 2014 WL 6983402, at *2 (remanding where "the ALJ did not even consider whether Ms. Dry's fibromyalgia constituted a severe impairment  SSR 12-2p does not meaningfully alter the ALJ's RFC analysis. In other words, the court is satisfied that the ALJ fully accounted for any limitations stemming from Shivock's fibromyalgia, even without following the subsequent guidelines provided by SSR 12-2p. Thus, the court will not remand.

17